**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190594-U

Order filed November 30, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| DAVE CARTER and REGINA BOHMANN, as Co-Special Administrators of the ESTATE OF CODY CARTER, Deceased, | ) ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois |
| Plaintiffs-Appellants, | ) ) | Appeal Nos. 3-19-0594, 3-19-0595, 3-19-0596, 3-19-0601 (Consolidated) |
| v. | ) ) | Circuit Nos. 13-L-906, 14-L-200, 14-L-203, 13-CH-2102 (Consolidated) |
| WESLEY TOWNSHIP, a body Politic, JENNIFER FENDER, Administrator of the Estate of CHEYENNE FENDER, Defendants (Wesley Township, a body Politic, Defendant-Appellee). | ) ) ) ) ) ) ) | Honorable Raymond Rossi Judge, Presiding. |

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justice McDade and Justice Wright concurred in the judgment.

**ORDER**

¶ 1     *Held*:   In consolidated action for wrongful deaths against Township arising out of automobile accident, trial court properly granted summary judgment in favor of Township pursuant to the Tort Immunity Act.

¶ 2     The combined plaintiffs (Plaintiffs) brought this consolidated action against Defendant

Wesley Township (the Township) to recover damages arising out of the deaths of their children

in an automobile accident that occurred on a Township road that had flooded after a rainstorm. The trial court denied the Plaintiffs' motion for partial summary judgment and granted the Township's motion for summary judgment. The Plaintiffs appeal the trial court's judgment.

¶ 3                                                     FACTS

¶ 4        James Bailey, as Special Administrator of the Estate of Matthew Bailey, Case No. 2014 L 200, Margo Sembach as the Special Administrator of the Estate of Micalah Sembach, Dave Carter and Regina Bohmann as the Special Administrators of the Estate of Cody Carter, and Jennifer Fender as Special Administrator for the Estate of Cheyenne Fender (collectively, Plaintiffs), each filed wrongful death and Survival Act claims against the Township. Their cases were consolidated before the trial court.

¶ 5        On March 11, 2013, Cheyenne Fender was driving a vehicle eastbound on Ballou Road over a waterway known as Forked Creek in Wesley Township. Matthew Bailey, Cody Carter, and Micalah Sembach were passengers in the vehicle. It had rained significantly on and prior to March 11, 2013, and the water from the rainfall had caused Forked Creek to flood over Ballou Road. As the vehicle approached a bridge spanning Forked Creek, there was water overflowing and pooling onto the road. After encountering the water, Fender lost control of the vehicle. The vehicle slid onto the bridge, collided with a guardrail on the bridge, knocked the guardrail off the bridge, and fell into the water beneath the bridge. The vehicle came to rest upside down in the creek. Fender, Bailey, Carter, and Sembach drowned in the creek.

¶ 6        The Township is a municipal entity located within an unincorporated area of Will County, Illinois. It is undisputed that: (1) the roadway and bridge crossing over Forked Creek at the accident site on Ballou Road are within the maintenance jurisdiction of the Township and its road district commissioner; (2) the Township does not own, supervise, maintain, operate,

manage, or control Forked Creek, including the portion of the creek near the bridge; (3) the Township did not employ police officers or own police cars or emergency vehicles. All police and law enforcement services for the Township were provided by the Will County Sheriff's Office.

¶ 7      Joe Rodawold was the road commissioner for Wesley Township on and before March of 2013. Rodawold was the only full-time employee of the Wesley Township Road District and the only person who had the authority to close roads, to place signs or barricades on roads, or to install, replace, or upgrade anything on the roads in the Township's maintenance jurisdiction. Rodawold knew that Ballou Road flooded approximately six times per year. During his deposition, Rodawold testified that the Township had never placed barricades or flashing lights on Ballou Road to close the road or to warn of flooding on the road, either immediately before the accident or on any prior occasion when the road had flooded.  The Township did not own any barricades or road closure equipment.

¶ 8      Rodawold further testified that he had observed water crossing over Ballou Road at approximately 5:00 a.m. on the day of the accident.  At that time, Rodawold noticed that water had accumulated on the west side of the bridge up to 20 feet from the bridge approach. Rodawold chose not to drive his Ford F350 truck through the water because he was concerned that the water might come up to the axles of his vehicle.

¶ 9      Rodawold further stated that, during heavy rain events in 2013, flooding would occur on Ballou Road as well as at least ten other locations on Township controlled roads within the Township.  All of these roads were flooded at the time of the accident.  According to Rodawold, flooding routinely occurred on these roads because the Township was situated at the bottom of the drainage system in southern Will County.  Rodawold testified that it would be impossible

3

from a financial standpoint to bring every one of these roads out of the flood plain. He stated that he had considered whether to try to alter the roadway on Ballou Road to reduce flooding but he determined that it would be prohibitively expensive.

¶ 10    Raymond Lainey, a witness for the Township, testified that he was traveling eastbound on Ballou Road near the accident site at approximately 4:52 p.m. on the day of the accident. Some distance west of the bridge, Lainey observed what he estimated to be roughly 50-60 feet of water over the road at 12 inches deep followed by 40 feet of exposed dry and clear roadway between the area where the water ended and the bridge deck. He also noticed that the bridge's south guardrail was missing. Lainey testified that, at the time he made these observations, it was not yet dusk and there was still daylight.

¶ 11    Bruce Gould, the County Engineer for Will County from 2008 to March 2017, testified by deposition. During his deposition, Gould testified that the conditions of Ballou Road in the vicinity of Forked Creek on the morning of March 11, 2013, made the roadway unsafe for use by the traveling public. Gould stated that it was the duty of the elected authority of the Will County highway system to protect persons using any roads within the system and to take care of any problems that existed. He testified that it is the highway commissioner's discretionary decision whether to close a road within the system he supervises. The decision whether to close a road due to the depth of water on the road is a "subjective" decision made by the highway commissioner. However, Gould opined that, if it gets to the point where the traffic cannot use the road, the County has no other choice but to close the road. Gould further stated that, if Rodawold had told him that he had a flooding problem on Ballou Road in the vicinity of Forked Creek and asked to borrow some barricades or lights or signs, Gould likely would have accommodated that request.

4

¶ 12    Raymond Semplinski, the administrator of the maintenance division for the Will County division of transportation at the time of the incident, also testified.  Based on his experience as the maintenance administrator and his review of the Will County Sheriff's report and the relevant deposition transcripts, Semplinski opined that, on the day of the accident, the portion of Ballou Road near Forked Creek was unsafe to the traveling public. Semplinski stated that, had that same condition arisen on a County highway, the affected pavement would have been closed to traffic as soon as practicable after it was discovered that standing water was overtopping the roadway. Semplinski further testified that, if Ballou Road had been part of the County's highway system on the date of the accident, and the County Department of Transportation had been aware of the flooding conditions testified to by Rodawold, immediate action upon notification would have been taken to close Ballou Road to the public and to place proper signage, lights, and/or barricades.  Semplinski agreed with Gould's statement that, if Rodawold had asked to borrow some barricades, lights, or signs, to address the flooding on Ballou Road, Gould likely would have accommodated that request.

¶ 13    Kenneth R. Agent testified on Plaintiffs' behalf as a controlled expert witness.  Argent prepared a report in which he opined that: (1) the accident occurred when the driver lost control of the vehicle after encountering water over West Ballou Road on the eastbound approach to the bridge over Forked Creek; (2) West Ballou Road should have been closed after the existence of water over the road was known; (3) the accident occurred during darkness with no source of illumination of the accident site; (4) there was no warning of the water until it was encountered; (5) even during daylight conditions, a driver approaching the accident site would not have been able to determine the depth of the water on the road; (6) the driver of the vehicle lost control of

5

the vehicle, which caused the decedents' deaths; and (7) the vehicle was out of control from the time it encountered water on Ballou Road until the time it struck the guardrail.

¶ 14    During his deposition, Agent proffered opinions as to the Township's duty under the circumstances and its breach of that duty.  He testified that

"nobody has to tell you to do anything. You have a duty as the person that's maintaining your roadway, the entity that's maintaining your roadway to be aware of the hazards of your roadway *** and then respond to the hazard, which wasn't done here. *** "You know where the water floods. Therefore, those are the places you go in advance, put a permanent sign up. And when water gets high, you go close the roads. That's their duty. *** When a road is impassable or dangerous because of water over it, your duty as the person, the entity in charge of the roadway is to close that road[.]"

¶ 15    Agent identified four things Wesley Township should have done to maintain Ballou Road in a passable condition and to alleviate the recurring flooding problems, including digging ditches next to the roadway, grading the turf adjacent to the roadway, installing a culvert underneath the roadway, and raising the elevation of the road.  However, Agent admitted that, even if all of these improvements were performed, water could still get over the roadway and it would not eliminate the possibility of water accumulating over Ballou Road.  Although he admitted that the existing signs posted on the corners of the bridge did not cause or contribute to the accident, he opined that the Township should have "initially provided warning signs or devices" in the form of an advance warning sign and barricade.

¶ 16    On July 16, 2018, the Township moved for summary judgment pursuant to multiple sections of the Local Governmental and Governmental Employees Tort Immunity Act (the Act),

6

745 ILCS 10/1-101 *et seq.* (West 2012). After receiving briefing and hearing oral argument on the Township's summary judgment motion, the trial court initially denied the motion. At that time, the trial court made the following findings of fact and law: (1) the Township had notice of problems, including flooding on Ballou Road, for years prior to the March 11, 2013, accident; (2) the Township's highway commissioner knew that the road flooded approximately six times per year; (3) the Township controlled the use and maintenance of the road; (4) the Township had a duty to use reasonable care to maintain its property, including Ballou Road, in a safe condition; (5) on the morning of the accident, the highway commissioner personally observed that the road was impassable and unsafe and turned his own truck around to avoid damage to the truck; (6) the flooding rendered Ballou Road unsafe; (7) it is undisputed that the Township took no action to close Ballou Road; (8) the Township had a duty to close Ballou Road under the circumstances; (9) the Township had no discretion in the matter (*i.e.*, the Township's duty to close Ballou Road under the circumstances was ministerial); and (10) the Township breached its duty.

¶ 17    On March 15, 2019, the Plaintiffs filed a motion for partial summary judgment on liability arguing that: (1) the Township had breached its duty to close the road and to prevent the Plaintiffs' decedents from traveling on it at the time of the accident, and (2) the Township's failure to take these actions was a proximate cause of the Plaintiffs' decedents' deaths. The Plaintiffs sought and were granted leave to file amended complaints in their respective actions. On or about April 3, 2019, Plaintiffs filed their final amended complaints, the operative complaints in this litigation.

¶ 18    On or about May 22, 2019, the Township filed its answer and affirmative defenses to the Plaintiffs' amended complaints. The Township asserted affirmative defenses of immunity under various sections of the Act. The Plaintiffs filed answers to the Township's affirmative defenses.

¶ 19        On June 19, 2019, the trial court denied the Plaintiffs' motion for partial summary judgment without making any findings of fact or conclusions of law. On July 19, 2019, the Plaintiffs filed a motion for clarification of the trial court's order denying their motion for summary judgment in which they asked the court to articulate factual findings supporting its Order.

¶ 20        On August 13, 2019, the Township filed a renewed motion for summary judgment seeking dismissal of the Plaintiffs' amended complaints on grounds of immunity under multiple sections of the Act. The trial court set the Township's motion for hearing on September 10, 2019. On September 4, 2019, the Plaintiffs moved to strike the Township's renewed motion for summary judgment.

¶ 21        At the September 10, 2019, hearing, the trial court granted the Township's renewed motion for summary judgment and dismissed the case without expressly ruling on the Plaintiffs' motions. During the hearing, the trial court stated that "the duty and the breach of duty either have been adjudicated or at this point I'm going to-- if not, then I would say, yes, there is a duty and there has been a breach of duty." When ruling for the Township, the court said, "[w]ell, I hope plaintiffs appeal and I hope I'm reversed *** I recognize this is probably the third time I changed my mind."

¶ 22        On October 7, 2019, the Plaintiffs filed a motion for clarification, modification and/or reconsideration of the trial court's Order and a motion to stay the Order pending the Plaintiffs' filing of a notice of appeal. On October 7, 2019, the trial court denied the Plaintiffs' motions for clarification, modification and/or reconsideration and stay.

¶ 23        This appeal followed.

8

¶ 24                                        ANALYSIS

¶ 25        Summary judgment is appropriate where the pleadings, depositions, and admissions on

file, together with any affidavits and exhibits, when viewed in the light most favorable to the

nonmoving party, indicate there is no genuine issue of material fact and that the moving party is

entitled to judgment as a matter of law. *County of Cook v. Village of Bridgeview*, 2014 IL App

(1st) 122164, ¶ 10. We review the trial court's ruling on a motion for summary judgment *de

novo*. *LaSalle Bank, N.I. v. First American Bank*, 316 Ill. App. 3d 515, 521 (2000).

¶ 26        The Plaintiffs argue that the trial court erred in granting summary judgment for the

Township pursuant to the Act and in failing to grant their motion for partial summary judgment.

¶ 27        The Township raises several arguments in support of the trial court's judgment, including

assertions of immunity under multiple section of the Act. However, we address only one of the

Township's arguments because we find it to be dispositive.

¶ 28        Section 3–110 of the Act provides:

             "Neither a local public entity nor a public employee is liable for any

             injury occurring on, in, or adjacent to any waterway, lake, pond, river or

             stream not owned, supervised, maintained, operated, managed or

             controlled by the local public entity." 745 ILCS 10/3-110 (West 2012).

¶ 29        It is undisputed that the Township does not own, supervise, maintain, operate, manage, or

control Forked Creek, including the portion of the creek near the bridge. It is also undisputed

that the Plaintiffs' decedents died when they drowned in Forked Creek. The Plaintiffs have not

alleged or presented evidence suggesting that the decedents died or were injured outside of the

creek, *e.g.* when the vehicle hit the guardrail. The Plaintiffs seek compensation solely for the

decedents' drowning deaths in the creek. Section 3-110 provides absolute, unqualified immunity

9

to the Township for deaths occurring in Forked Creek, a river that the Township does not own, supervise, manage, maintain, or control.

¶ 30　　　　Our appellate court's decision in *McCoy v. Illinois International Port District*, 334 Ill. App. 3d 462 (2002), is directly on point. In *McCoy,* a longshoreman slipped off a sea wall and fell into the Calumet River, where he drowned. By statute, the Illinois International Port District (Port District) was responsible for the maintenance of the facilities on the properties near the water. *McCoy*, 334 Ill. App. 3d at 464. The Port District's contract with the decedent's employer provided that the Port District retained all control and possession of the property at the landing where the decedent worked, and that the Port District had the duty to "provide and maintain in good order and repair for the use intended the dock, wharf and open land." *Id.* at 463. Photographs taken by OSHA after the accident showed that the concrete area on which the decedent was required to work was crumbled and dilapidated, and the Port District's executive director testified that the dock had not been repaired for at least 15 years prior to the accident. *Id.*

¶ 31　　　　The special administrator of the decedent's estate sued the Port District alleging that it had negligently failed to maintain the property in questions, specifically the sea dock/wall from which the decedent fell. *Id.* at 464. The Port District moved to dismiss, arguing that it was immunized from liability pursuant to section 3-110 of the Act because it did not own, supervise, maintain, operate, manage or control the Calumet River. The trial court granted the Port District's motion and dismissed the negligence count of the claimant's complaint.

¶ 32　　　　On appeal, the plaintiff argued that section 3-110 should not apply because the Port District played a role in the maintenance, control, supervision, and management of the river by conducting business on the river and through its responsibility for the sea walls that contained

10

the river. *Id.* at 466. Our appellate court affirmed the trial court's dismissal of the plaintiff's negligence count pursuant to section 3-110. Our appellate court ruled that the plain language of section 3-110 unambiguously provides that, if a local public entity or public employee does not own, supervise, maintain, operate, manage, or control the river or other waterway, "there is no liability for any injury occurring on, in, or adjacent to the waterway." *Id.* at 468. Our court held that the Port District's statutory duty was limited to the maintenance of the port, harbor, and water and land terminal *facilities*, and that the Port District did not control the waterways themselves. *Id.* Accordingly, our appellate court found that section 3-110 immunized the Port District from liability for the decedent's death. *Id.*

¶ 33        Other decisions of our appellate court have applied the same analysis and reached similar results. For example, in *Choice v. YMCA of McHenry County*, 2012 IL App (1st) 102877, our appellate court held that section 3-110 immunized a public charter school and the board of education from liability for the deaths of students who drowned on the Fox River while attending a school-sponsored event at a nearby camp because the school defendants did not control or "supervise" the Fox River. Our appellate court reasoned that, although the teacher chaperones had a duty to supervise the *students*, they did not "supervise" the *river* because they had no right to control access to the river "derived from a proprietary or similar interest in the situs of the body of water itself." *Choice*, 2012 IL App (1st) 102877, ¶ 49.

¶ 34        Similarly, in *Frayne v. Dacor Corp.*, 362 Ill. App. 3d 575 (2005), our appellate court affirmed summary judgment for various municipal fire protection districts who controlled and supervised a dive rescue training exercise during which a firefighter participating in the exercise drowned. Our appellate court held that, although the fire protection districts controlled the

11

exercise, they had no authority to control, supervise, or maintain the lake where the exercise and the drowning occurred. *Id.* at 581.

¶ 35        Likewise, in *Ward v. Myah's Children Connection, Inc.*, 2018 IL App (3d) 160637-U, we affirmed the dismissal of a third-party complaint for contribution against the Peoria Park District under section 3-110. The plaintiff had sued a daycare center when a child in its care wandered away from a playground built and maintained by the park district and drowned in the flood waters of the Illinois River, which was adjacent to the playground. The Plaintiff alleged that the park district had engaged in willful and wanton conduct by: (1) building and maintaining a playground near the river; (2) failing to install a permanent fence or temporary fencing to limit access to the river; and/or (3) failing to close the playground or prevent use of the playground while the river was above flood stage levels. *Id.* ¶ 4. Following *McCoy*, we held the park district was immune from liability under section 3-110 because there were no allegations that it owned or controlled the river or any part of the river, and "control over the land adjacent to the river did not give the Park District control over the river." *Id.* ¶ 12. We found the case to be analogous to *McCoy*, wherein a public entity controlled the sea wall adjacent to the river where the decedent drowned, but did not control the river itself. *Id.* ¶ 11.

¶ 36        Following *McCoy*, *Choice*, *Frayne*, and *Ward*, we hold that the Township is immune from liability for the decedents' deaths under section 3-110. The undisputed facts in this case establish that the Township did not own, control, manage, or supervise the river in which the decedents drowned. Accordingly, the plain and unambiguous terms of section 3-110 entitle the Township to absolute, unqualified immunity in this matter.

¶ 37        The Plaintiffs argue that absolving the Township of liability pursuant to section 3-110 would be an "absurd" result because: (1) the bridge at issue is within the Township's

12

maintenance jurisdiction; (2) the purpose of the bridge is to traverse the creek, and the purpose of the bridge's guardrails is to keep travelers on the road and out of the water; (3) the "injury" began when the Plaintiffs' decedents encountered the flooding conditions on the Township's road and lost control of the car; (4) the accident was caused by the Township's negligence, even though the decedents "happened to end up in the water"; and (5) "just because an injury occurs adjacent to a waterway cannot insulate an otherwise liable entity even if that entity does not control any aspect of the waterway."

¶ 38        The Plaintiffs' arguments contradict the plain terms of section 3-110 and our appellate court's holdings in *McCoy* and its progeny. In *McCoy*, we held that a public entity was not liable for a decedent's drowing death even though it controlled the seawall surface from which the decedent fell into the river, it had a duty to maintain that surface, it failed to properly maintain that surface, and its failure to repair the crumbled and dilapidated condition of the seawall surface could have been a contributing cause of the decedent's fall into the river. In *Choice* and *Ward*, we held that the fact that a public entity owns or controls property adjacent to a river where a decedent drowns does not mean that it controls or supervises the river. Thus, even if the public entity fails to adequately protect persons using its land from the dangers posed by an adjacent river (for example, by failing to close the public land adjacent to the river, failing to erect barriers to the river, or failing to properly maintain the land), section 3-110 immunity precludes liability for injuries that occur in, on, or adjacent to the river. *McCoy*, 334 Il. App. 3d at 468; *Choice*, 2012 IL App (1st) 102877, ¶ 49; *Ward*, 2018 IL App (3d) 160637-U, ¶¶ 11-12.

¶ 39        Even if we were to agree with the Plaintiffs' argument that the application of section 3-110 in this manner leads to an "absurd" and "ludicrous" result in this case, we cannot ignore the unambiguous requirements of section 3-110. See *Choice*, 2012 IL App (1st) 102877, ¶ 27

13

(although "we must assume that the legislature did not intend to create an absurd or unjust result \*\*\*, we are also mindful that the language of the statute is the surest and most reliable indicator of legislative intent, and where that language is clear and unambiguous, we must apply that language without further aids of statutory construction").

¶ 40     The Plaintiffs suggest that a public entity's duty to maintain roads within its jurisdiction in a safe condition for use by the general public overrides the immunity provisions contained in Article III of the Act, including section 3-110.  The Plaintiff points to section 3-102(a) of the Act, which provides that:

> "[e]xcept as otherwise provided in this Article, a local public entity has
>
> the duty to  exercise ordinary care to maintain its property in a
>
> reasonably safe condition for the use in the exercise of ordinary care of
>
> people whom the entity intended and permitted to use the property in a
>
> manner in which and at such times as it was reasonably foreseeable that
>
> it would be used, and shall not be liable for injury unless it is proven that
>
> it has actual or constructive notice of the existence of such a condition
>
> that is not reasonably safe in reasonably adequate time prior to an injury
>
> to have taken measures to remedy or protect against such condition."
>
> 745 ILCS 10/3-102(a) (West 2012).

The Plaintiffs characterize the Township's failures to close Ballou road, to erect barricades, to place warning signs, and to alter and/or improve the road conditions to prevent or reduce flooding as a breach of the Township's duty to maintain roads within its jurisdiction pursuant to section 3-102(a).  They contend that, because it is undisputed that the Township had actual notice of the flooding on Ballou road near

14

the bridge on the day of the accident, section 3-102(a) renders the Township liable for the decedents' deaths notwithstanding section 3-110 and the other immunities conferred in Article III of the Act.

¶ 41  We do not find these arguments to be persuasive. As our supreme court has noted, section 3-102(a) provides that a local public entity has a duty to maintain its property "*[e]xcept as otherwise provided in this Article*." (Emphasis added.) 745 ILCS 10/3-102(a) (West 2012); *West v. Kirkham*, 147 Ill.2d 1, 14 (1992). It is "otherwise provided" in section 3-110, which is located in Article III of the Act together with section 3-102(a), that a public entity is not liable "for any injury occurring on, in, or adjacent to any waterway, lake, pond, river or stream not owned, supervised, maintained, operated, managed or controlled by the local public entity." 745 ILCS 10/3-110 (West 2012). Unlike immunities conferred by other sections of Article III, section 3-110 does not state that the immunity it prescribes is subject to the duty to maintain codified in section 3-102(a).[1] Rather, it creates an absolute and unqualified immunity from liability for the category of injuries it identifies. "We may not depart from the plain language of an unambiguous statute by reading into it exceptions, limitations, or conditions not expressed by the legislature." *Taylor v. Pekin Insurance Co.*, 231 Ill. 2d 390, 395 (2008); see also *Sinkus v. BTE Consulting*, 2017 IL App (1st) 152135, ¶ 14.

¶ 42  Accordingly, even assuming that the Township had a duty to take the measures urged by the Plaintiffs, that it had actual notice of the hazardous flood conditions, and that it breached its duty to the Plaintiffs, it is immune from lability in this case. Because we hold that summary judgment for the Township was proper under section 3-110 of the Act, we do not address the

---

[1] See 745 ILCS 3-105(c) (West 2012) (providing that a public entity is immune from liability for injuries caused by the effects of weather conditions on public roads, but stating that "[n]othing in this Section shall relieve the local public entity of the duty to exercise ordinary care in the maintenance of its property as set forth in Section 3-102."

15

Township's assertions of immunity under other sections of the Act or the Plaintiffs arguments on those issues.

¶ 43                                     CONCLUSION

¶ 44        For the foregoing reasons, we affirm the judgment of the circuit court of Will County granting the Township's motion for summary judgment and denying the Plaintiffs' motion for partial summary judgment.

¶ 45        Affirmed.